**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | Bankruptcy Case No. 15 B 28696 |
| | ) | |
| TODD S. HORLBECK, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | Honorable Janet S. Baer |
| _____ | ) | |
| | ) | |
| TILLMAN ENTERPRISES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary Case No. 16 A 00026 |
| | ) | |
| TODD S. HORLBECK, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**MEMORANDUM OPINION**

Todd Horlbeck filed a chapter 7 bankruptcy petition on August 21, 2015. During the pendency of Horlbeck's case, Tillman Enterprises, LLC ("Tillman") filed a three-count adversary complaint seeking a determination that a debt Horlbeck owes to Tillman is not dischargeable pursuant to 11 U.S.C. §§ 523(a)(19), (a)(2)(A), and (a)(2)(B) (Counts I, II, and III, respectively).[1] The matter is now before the Court for ruling on the parties' cross-motions for summary judgment. For the reasons set forth below, the motions are granted in part and denied in part. Horlbeck is entitled to summary judgment on Count I under § 523(a)(19), and Tillman is entitled to summary judgment on Counts II and III under §§ 523(a)(2)(A) and (a)(2)(B).

---

[1] Unless otherwise noted, all statutory references are to the Bankruptcy Code, 11 U.S.C. §§ 101 to 1532.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

## BACKGROUND

A careful review of the pleadings and motions, as well as the statements and exhibits attached thereto, reveals that there is no genuine dispute as to any material fact. Not surprisingly, Horlbeck and Tillman tell different versions of the same story, but the material facts are the same. At its heart, this case involves a hedge fund manager, a wealthy family, the investment of over $3,000,000, and the loss of much of that investment between 2007 and 2008.

Todd Horlbeck, the debtor in the underlying bankruptcy case, managed a hedge fund from its inception in 2002 to its liquidation in 2009. During those years, seven members of the Tillman family (collectively, the "Tillman Family") invested their money through the hedge fund, either in an individual capacity or through a legal entity.[2] Upon liquidation of the hedge fund, the members of the Tillman Family received only a fraction of their total investment. As a result, they investigated Horlbeck and learned that the quarterly statements that he supplied to investors had been inaccurate. Horlbeck maintains that most of the inaccurate values reported in the statements were the result of miscalculations. He admits, however, that he began to knowingly report inflated account values after January 9, 2008. Eventually, Horlbeck agreed to pay the Tillman Family $1,265,000 in exchange for the release of potential claims against him. Despite that agreement, he failed to pay the Tillman Family and subsequently filed bankruptcy.

---

[2] The individuals are Warner Tillman, Burton Tillman, Joel Tillman, Josh Tillman, Julie Tillman, Sam Wiley, and Jenny Wiley. The entities are the Estate of Burton Tillman, the Warner Tillman Trust, and Tillman Enterprises, LLC.

2

## A. The Horlbeck-Tillman Investment Relationship

Horlbeck first met a member of the Tillman Family when he approached Warner Tillman at his place of business in 1992. (Adv. No. 16-00026, Dkt. No. 106-2 at 3.[3])  Soon thereafter, Warner began to use Horlbeck as an investment advisor. (*Id.*)  In 2002, after a decade of managing investments for Warner, Horlbeck established a hedge fund called HCM L.P. (*Id.*)  The hedge fund was structured as a limited partnership of which Horlbeck Capital Management LLC was the general partner, and investors were limited partners. (*Id.*)  Todd Horlbeck served as the manager of Horlbeck Capital Management LLC, which in turn served as the manager of HCM L.P. (*Id.*)

Between 2003 and 2008, the Tillman Family invested a total of $3,120,000 through HCM L.P. on eleven separate occasions, on the dates and in the amounts set forth in the following table:

| Account Holder | Date | Amount |
|---|---|---|
| Tillman Enterprises, LLC | 12/24/2002 | $1,000,000 |
| Josh Tillman | 01/02/2003 | $250,000 |
| Burton Tillman | 12/24/2003 | $200,000 |
| Warner Tillman Trust | 01/02/2004 | $200,000 |
| Warner Tillman Trust | 09/29/2006 | $500,000 |
| Joel Tillman | 01/15/2007 | $60,000 |
| Julie Tillman | 01/18/2007 | $60,000 |
| Julie Tillman | 04/01/2007 | $100,000 |
| Joel Tillman | 04/30/2007 | $100,000 |
| Sam and Jenny Wiley | 06/30/2007 | $50,000 |
| Estate of Burton Tillman | 01/03/2008 | $600,000 |
| | **Total** | **$3,120,000** |

(Adv. Dkt. 85-37 at 2-3, Exs. 2A-2G.)  The investments were memorialized by subscription agreements that contained anti-reliance clauses. (*Id.*)  Under those clauses, the members of the Tillman Family represented that, in making the decision to invest, they relied solely upon a private placement memorandum and its ancillary documents and materials, along with their own

---

[3] All references to the adversary docket ("Adv. Dkt.") are to Adversary Proceeding No. 16-00026, and all references to the bankruptcy docket ("Bankr. Dkt.") are to Bankruptcy Case No. 15-28696.

investigations. (*Id.*) Further, they acknowledged that no representations outside of the memorandum and partnership agreement had been made. (*Id.*)

## B. The False Account Statements and HCM L.P.'s Collapse

Throughout the life of HCM L.P., Horlbeck sent quarterly statements to investors that reflected the number of shares owned, the net asset value per share,[4] and the total value of each account. (Adv. Dkt. 107-1 at 6.) At some point, Horlbeck decided not to disclose the actual 2007 year-end values to investors. (*Id.*) He made that decision "in an effort to make the fund's performance appear better than it was." (Adv. Dkt. 106-2 at 15.) Specifically, Horlbeck admits that after January 7, 2008, he began to knowingly overstate account values, starting with the statement for the fourth quarter of 2007 and continuing with each statement issued through the end of 2008. (Adv. Dkt. 107-1 at 8.) Horlbeck says that he learned in May or June of 2009 that the values in the statements had also been inaccurate for the first three quarters of 2007. (*Id.*) In fact, the values in the statements had been inaccurate since the inception of the hedge fund. (*See* Adv. Dkt. 106-2 at 14-15.) After Horlbeck issued the last account statement in January 2009, he wrote letters to investors to advise them that HCM L.P. would be closing in April 2009. (*Id.* at 10-11.) Subsequently, Horlbeck liquidated HCM L.P., and then he returned $554,162.42 to Tillman and the Warner Tillman Trust, $1,145,837.58 less than the $1,700,000 that they invested. (*Id.* at 11.) No evidence was offered of losses incurred by other members of the Tillman Family.

## C. Investigations and Settlements

After HCM L.P.'s liquidation, several parties launched parallel investigations into Horlbeck's management of the hedge fund. Among them, the Financial Regulatory Authority,

---

[4] Horlbeck states that he calculated the net asset value by subtracting the hedge fund's "short" positions from its "long" positions. (Adv. Dkt. 85-37 at 5.)

4

Inc. ("FINRA"),[5] a securities industry regulator, sent both requests for information and investigative questions to Horlbeck and also conducted an on-the-record interview with him. (*Id.* at 11-31.) Eventually, Horlbeck executed a letter of acceptance, waiver, and consent with FINRA (the "AWC Agreement"), agreeing to a permanent bar from the securities industry. (*Id.* at 31.) The Tillman Family initially engaged in direct correspondence with Horlbeck but eventually hired an attorney to formally investigate and negotiate a settlement. (*Id.* at 26-31.)

On May 19, 2009, soon after Horlbeck had liquidated the hedge fund, he wrote a letter to Warner Tillman. The letter informed Warner that there had been "performance and reporting inaccuracies" in the quarterly statements but that "these inaccuracies ha[d] not altered the overall results . . . or the amount of [Warner's] final distribution." (*Id.* at 19-20.) Around the same time, FINRA sent Horlbeck a list of investigative questions about his management of the hedge fund. (Adv. Dkt. 111-1 at 13-14.) On July 9, 2009, Horlbeck responded to FINRA by admitting that "in an effort to make the fund's performance appear better than it was, [he] reported to partners a valuation that was not accurate . . . . [He] reported to partners a valuation that was better than the actual valuation." (Adv. Dkt. 107-1 at 16, Ex. M.)

Less than two months later, on August 28, 2009, Horlbeck sent letters to several of the hedge fund's investors, including members of the Tillman Family. (*Id.* at 9.) In those letters, Horlbeck claimed that he "had discovered errors with the [n]et [a]sset [v]alue of . . . HCM L.P.," that "some partners were inadvertently overpaid . . . approximately $464,988," and that members of the Tillman Family were owed additional amounts due to the overpayments. (Adv. Dkt. 85-37 at 6, Ex. 11.) The letters did not disclose that Horlbeck was subject to an investigation by FINRA.

---

[5] FINRA is a "not-for-profit organization authorized by Congress to protect America's investors by making sure [that] the broker-dealer industry operates fairly and honestly." *About FINRA*, www.finra.org/about (last visited August 23, 2018).

Instead, Horlbeck self-servingly quoted his own letter to FINRA about compensation stating: "I did not take all the performance based compensation to which I was entitled, and I left virtually all of my investment in the fund throughout its existence . . . ." (*Id.*) In the August 2009 letters, Horlbeck offered to sign promissory notes for repayment of the additional amounts owed in exchange for releases of claims against him. (*Id.*)

After the members of the Tillman Family received the letters, they hired an attorney to investigate Horlbeck and negotiate a settlement. (Adv. Dkt. 106-2 at 26-31.) Throughout the negotiations, Horlbeck continued to seek the release of claims against him. In a November 10, 2009 letter to investors, Horlbeck wrote, "I have received most of the settlements and releases back." (Adv. Dkt. 85-37 at 7, Ex. 12.) For investors who had not already settled, Horlbeck enclosed photocopies of checks that would be sent upon the receipt of signed releases. (*Id.*) The checks were not for the full amounts that Horlbeck claimed to owe, so he again offered to send promissory notes for repayment of the remaining amounts. (*Id.*) Later, in a November 20, 2009 email to Warner, Horlbeck again sought release and threatened that his "other option [was] simply to file for bankruptcy protection . . . but [that he was] reluctant to do it." (*Id.,* Ex. 13.)

All the while, Horlbeck downplayed the existence and intensity of FINRA's ongoing investigation and discouraged Tillman from learning more about it. In a February 1, 2010 email, Horlbeck informed Warner Tillman that FINRA would probably call to discuss a letter that Warner had sent to him. (*Id.* at 9, Ex. 20.) Horlbeck told Warner, "You are free to discuss anything, of course, but [FINRA's] goals are quite a bit different from what yours might be, and therefore discussing less, or nothing, rather might be the safest course of action." (*Id.*) Subsequently, on March 10, 2010, Horlbeck emailed Warner to say, among other things, that he had retained an attorney for his "dealings" with FINRA. (*Id.* at 9, Ex. 21.) Finally, in a July 2, 2010 email,

Horlbeck went so far as to stress that Tillman should go to FINRA only as "a last resort." (Adv. Dkt. 111-1 at 27.) In that email, Horlbeck also stated that there was a strong interest the Tillman Family not contacting FINRA, warning that such involvement would end his career. (*Id.*)

The parties eventually reached a settlement (the "Settlement Agreement") whereby Horlbeck would be released from any and all claims arising from the Tillman Family's investments and the management of the hedge fund in exchange for a cash payment of $22,500 and a promissory note (the "Promissory Note") to pay $1,242,500 over twenty years to Tillman on behalf of the Tillman Family. (Adv. Dkt. 38 at 8-10; Adv. Dkt. 106-2 at 28-29.) The Settlement Agreement required Horlbeck to provide various documents, including a financial affidavit (the "Financial Affidavit") that disclosed assets and liabilities. (Adv. Dkt. 106-2 at 29.) The Agreement also included a provision that would postpone payments under the Promissory Note if Horlbeck was suspended by FINRA from transacting business. (*See* Adv. Dkt. 82 at 9, Ex. S.)

The Tillman Family signed the Settlement Agreement on September 27, 2010 but did not immediately send it to Horlbeck. Instead, their attorney sent Horlbeck's attorney an email listing several items, including the Financial Affidavit, that needed to be completed and returned before the Settlement Agreement could be finalized. (*Id.*, Ex. R.) Soon thereafter, on October 14, 2010, the Tillman Family's attorney emailed Horlbeck's attorney a copy of the signed Settlement Agreement with an instruction "to hold [the agreement] in escrow subject to our receipt and approval of the documents from your client." (*Id.,* Ex. S.) Horlbeck ultimately signed the Financial Affidavit, dated October 14, 2010, which disclosed information about the income, expenses, assets, and liabilities of both Horlbeck and his wife. (Adv. Dkt. 106-2 at 29.) Specifically, the Financial Affidavit disclosed $550,000 in annual income, two notes payable to banks, and no contingent liabilities. (*See* Adv. Dkt. 82 at 10, Ex. U.)

7

Unbeknownst to Tillman, FINRA's investigation had been escalating during the settlement negotiations. In the fall and winter of 2009, while Horlbeck was actively pursuing releases from investors, he was also producing documents and answering investigative questions in response to inquiries sent by FINRA. In November 2010, a month after the execution of the Financial Affidavit, FINRA conducted an on-the-record interview of Horlbeck. During that interview, Horlbeck admitted, among other things, that he had been paying investors under promissory notes. (Adv. Dkt. 107-1 at 20, Ex. X.) Subsequently, on May 17, 2011, several months after the parties had finalized the Settlement Agreement, FINRA advised Horlbeck of its preliminary determination to recommend disciplinary action against him. (Adv. Dkt. 85-37 at 9-10.) Eventually, on December 13, 2011, Horlbeck and FINRA entered into the AWC Agreement. (Adv. Dkt. 106-2 at 31.) In that Agreement, FINRA determined and Horlbeck accepted that he had violated the regulator's rules by understating losses on account statements sent to investors. (*Id.*) As a result, Horlbeck agreed to an indefinite bar from association with any FINRA member, thereby limiting his ability to work in the securities investment industry. (*Id.*)

### D. Breach of the Promissory Note and Filing of Horlbeck's Bankruptcy

In October 2013, Tillman filed suit against Horlbeck in state court for breach of the Promissory Note. (*Id.*) The state court dismissed the case without prejudice after Horlbeck filed a chapter 7 bankruptcy petition on August 21, 2015. (*Id.*) Schedule F of Horlbeck's bankruptcy petition lists, among other debts, approximately $1.3 million owed to "several of the Fund's investors who had never signed an agreement releasing [him]." (Adv. Dkt. 85-37 at 10; Bankr. Dkt. 12 at 9-12.) Horlbeck indicated that the debts were for promissory notes executed between 2008 and 2010, in amounts ranging from $7,093.60 to $550,000. (*Id.*)

8

Subsequently, Tillman filed an adversary complaint seeking a determination that the debt Horlbeck owes under the Settlement Agreement and Promissory Note is not dischargeable. Tillman then amended the original complaint after Horlbeck filed an initial motion to dismiss. In response, Horlbeck filed a motion to dismiss the amended complaint that was denied by Judge Cassling, who was then presiding over the case. After engaging in discovery, the parties filed the cross-motions for summary judgment that are now before the Court for ruling.

## SUMMARY JUDGMENT

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) (made applicable to adversary proceedings by Fed. R. Bankr. P. 7056). On a motion for summary judgment, the court must decide, based on the evidence available, whether there is a material fact in dispute that requires a trial. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). A genuine dispute as to a material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making that determination, all reasonable inferences drawn from the underlying facts should be viewed in the light most favorable to the nonmovant. *Smeigh v. Johns Mansville, Inc.*, 643 F.3d 554, 560 (7th Cir. 2011). Although the parties have filed cross-motions for summary judgment, the existence of a dispute of material fact is not necessarily precluded. *Case & Co., Inc. v. Bd. of Trade of Chi.*, 523 F.2d 355, 360 (7th Cir. 1975).

When the parties have filed cross-motions, courts consider the arguments and evidence supporting and opposing each motion before ruling on them separately. *Am. Broad. Co. v. Maljack Prod., Inc.*, 34 F. Supp. 2d 665, 669 (N.D. Ill. 1998). The burden of establishing that there are no disputed material facts falls on each movant. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

9

If no genuine dispute exists, then summary judgment is appropriate when the applicable law supports the moving party's position. Fed. R. Civ. P. 56(a). For a defendant, that means: "(1) showing that there is an absence of evidence supporting an essential element of the [plaintiff's] claim; or (2) presenting affirmative evidence that negates an essential element . . . ." *Hummel v. St. Joseph Cty. Bd. of Comm'rs*, 817 F.3d 1010, 1015-16 (7th Cir. 2016) (citing *Modrowski v. Pigatto*, 712 F.3d 1166, 1169 (7th Cir. 2013)).

### A. Evidentiary Standards

All factual assertions made in a summary judgment motion must be supported by citations to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits, and other materials. Fed. R. Civ. P. 56(c)(1)(A). A party may object to supporting material on the basis that it cannot be presented in a form that would be admissible at trial. Fed. R. Civ. P. 56(c)(2). When ruling on such objections, courts focus not on the admissibility of the evidence's form, but on the admissibility of its contents. *See Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016). For example, while a document itself might be inadmissible at trial, its contents may be admitted through direct testimony or to refresh a witness's recollection. *See, e.g., Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) (concluding the contents of a diary could be considered because they could be presented in an admissible form at trial).

Federal Rule of Civil Procedure 56 has been described as "an enlarging provision as to what may be considered, not a restriction." *Yong Hong Keung v. Dulles*, 127 F. Supp. 252, 252 (D. Mass. 1954) (quoted in 10A Charles Alan Wright et al., *Federal Practice and Procedure* § 2721 (4th ed. 2018)). Thus, objections to the admissibility of evidence may be overruled at the summary judgment stage so long so the court is satisfied that the contents of the evidence could

10

be presented in admissible form at trial. *Wragg v. Vill. of Thorton*, 604 F.3d 464, 466 (7th Cir.

2010); *see, e.g., Lishamer v. Wal-Mart Stores, Inc.*, No. 15 C 6159, 2018 WL 620037, at *1 n.1

(N.D. Ill. Jan. 30, 2018) (summarily overruling the defendant's evidentiary objections because the

"plaintiff [was] likely to be able to cure [the] problems at trial").

### B. Horlbeck's Evidentiary Objections

Before discussing the merits of the parties' arguments, the Court first addresses the

evidentiary objections raised by Horlbeck. Specifically, Horlbeck objects to twenty-seven of the

forty-two paragraphs in Tillman's statement of facts, often for more than one reason per paragraph.

(Adv. Dkt. 109 at 3.) According to Horlbeck, sixteen paragraphs do not accurately reflect the

evidence cited; eighteen paragraphs contain conclusory statements; ten paragraphs cite materials

containing hearsay; and several paragraphs are irrelevant and cite to evidence lacking foundation.

(*Id.* at 3-21.) In addition, Horlbeck objects on similar grounds to several paragraphs in Tillman's

statement of additional facts. (Adv. Dkt. 111-1.)

Many of Horlbeck's objections are inconsequential because they relate to immaterial

allegations. For example, Horlbeck devotes almost three pages to the argument that the materials

cited do not support the allegations that Warner Tillman invested money on behalf of his family

members and that he was the primary contact with Horlbeck. (Adv. Dkt. 106-2 at 4-7.) Regardless

of whether those allegations are supported by the evidence, they are immaterial because they are

unrelated to the elements of the claims at issue. Any lack of evidentiary support is therefore

irrelevant because a dispute about an immaterial allegation does not preclude summary judgment.

*See Anderson*, 477 U.S. at 248.

Horlbeck's other evidentiary objections are without merit for a number of reasons. First,

many of the exhibits to which Horlbeck objects are also offered as materials in support of

Horlbeck's own motion for summary judgment. Furthermore, several of Tillman's statements do accurately reflect the evidence cited, making Horlbeck's argument to the contrary erroneous. For example, Horlbeck objects to Tillman's statement that all of the members of the Tillman Family received similar letters dated August 28, 2009 because he claims that the exhibit cited does not contain copies of the letters. (Adv. Dkt. 106-2 at 21.) A review of Exhibit M to Tillman's motion reveals that Horlbeck's objection is unfounded—copies of all of the letters are included. (*See* Adv. Dkt. 82, Ex. M.) Many other statements objected to for lacking evidentiary support or being conclusory in nature were admitted to by Horlbeck elsewhere in the record. The remaining objections, that materials cited are inadmissible for reasons such as hearsay, irrelevance, and lack of foundation, are overruled because they are either without merit or the Court is satisfied that the content of those materials could be presented in an admissible form at trial. *See* Fed. R. Civ. P. 56(c)(2).

## DISCUSSION

Tillman seeks a summary judgment determination that the debt owed under the Settlement Agreement and Promissory Note is not dischargeable pursuant to §§ 523(a)(19) and (a)(2)(B). Horlbeck, in turn, moves for summary judgment on the basis that Tillman cannot prove the elements of §§ 523(a)(19), (a)(2)(A), and (a)(2)(B). Thus, although Tillman has not sought a determination under § 523(a)(2)(A), Horlbeck has, so all three statutory exceptions to discharge will be addressed.

To prevail, Tillman must prove that each element of §§ 523(a)(19) and (a)(2)(B) is satisfied by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 291 (1991). Conversely, to defeat the claims, Horlbeck must show that there is either an absence of evidence or a presence of affirmative evidence negating an essential element. *See Hummel*, 817 F.3d at

1015-16. "[E]xceptions to discharge are to be construed strictly against a creditor and liberally in favor of a debtor" in order to advance the "fresh start" policy behind bankruptcy. *Goldberg Sec., Inc. v. Scarlata (In re Scarlata)*, 979 F.2d 521, 524 (7th Cir. 1992) (internal quotations omitted). That being said, the privilege of obtaining a fresh start is not absolute. The Bankruptcy Code has long advanced the policy that relief should be afforded to only an "honest but unfortunate debtor" by prohibiting the discharge of debts incurred by dishonest conduct like fraud. *Cohen v. de la Cruz*, 523 U.S. 213, 217 (1998) (internal quotation omitted).

### A. Section 523(a)(19) (Count I)

Section 523(a)(19) provides that debts for securities violations and fraud are not dischargeable under certain circumstances. 11 U.S.C. § 523(a)(19). The Sarbanes-Oxley Act of 2002 originally added § 523(a)(19) to the Bankruptcy Code "to make judgments and settlements arising from state and federal securities law violations brought by state or federal regulators and private individuals non-dischargeable," thus "protecting victims' ability to recover their losses." S. Rep. No. 107-146, at 2-12 (2002); 148 Cong. Rec. S7418-01, at S7418 (daily ed. July 26, 2002) (statement of Sen. Leahy). Three years later, BAPCPA amended § 523(a)(19) to clarify that judgments, orders, and settlements establishing liability for securities violations or fraud need not be made pre-petition. *Floyd v. Hill (In re Hill)*, 495 B.R. 646, 656 (Bankr. D.N.J. 2013). In its current form, § 523(a)(19) provides as follows:

(a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—

(19) that—

(A) is for—

(i) the violation of any of the Federal securities laws (as that term is defined in section 3(a)(47) of the Securities Exchange Act of 1934), any

13

of the State securities laws, or any regulation or order issued under such Federal or State securities laws; or

(ii) common law fraud, deceit, or manipulation in connection with the purchase or sale of any security; and

(B) results, before, on, or after the date on which the petition was filed, from—

(i) any judgment, order, consent order, or decree entered in any Federal or State judicial or administrative proceeding;

(ii) any settlement agreement entered into by the debtor; or

(iii) any court or administrative order for any damages, fine, penalty, citation, restitutionary payment, disgorgement payment, attorney fee, cost, or other payment owed by the debtor.

11 U.S.C. § 523(a)(19).

To prevail under § 523(a)(19), the moving party must prove that: (1) the debt stems from a securities violation or fraud; and (2) the debt is memorialized by a judicial or administrative order or in a settlement agreement. *See* 11 U.S.C. § 523(a)(19); *see also Filian v. Jansma (In re Jansma)*, 09 AP 00444, 2010 WL 282511, at *3-6 (Bankr. N.D. Ill. Jan. 21, 2010).

Here, the Settlement Agreement satisfies subsection (B). Under that Agreement, Tillman released Horlbeck from, among other things, any and all claims for securities violations and fraud in exchange for $1,265,000. However, the Agreement also provides that the parties reached the settlement without any acknowledgement of liability.[6] Thus, to satisfy the requirement of subsection (A), there must be a determination that Horlbeck is liable for an underlying securities

---

[6] A settlement agreement containing a "no admission of liability" clause does not preclude litigation of the nature of the underlying debt in bankruptcy court. *Winkler v. Pierce (In re Pierce)*, 563 B.R. 698, 706-07 (Bankr. C.D. Ill. 2017) (citing *Brown v. Felsen*, 442 U.S. 127 (1979)). To the contrary, under *Brown*, bankruptcy courts must look behind the settlement agreement to determine whether the nature of the underlying debt falls into one of the categories of debts that are not dischargeable pursuant to § 523(a). *Id.*

violation or fraud. Before turning to the merits of the securities claims, the Court addresses whether it has jurisdiction to make such a determination.

### 1. Bankruptcy Court Jurisdiction Under § 523(a)(19)

Shortly after the enactment and amendment of § 523(a)(19), some bankruptcy courts held that the determination of liability for a securities violation must be made in a non-bankruptcy forum. *Faris v. Jafari (In re Jafari)*, 401 B.R. 494, 496 (Bankr. D. Colo. 2009) (holding that securities fraud debt must be memorialized in an order or settlement agreement outside the bankruptcy case); *Holland v. Zimmerman (In re Zimmerman)*, 341 B.R. 77, 80 (Bankr. N.D. Ga. 2006) ("Section 523(a)(19) expressly contemplates a postpetition determination of liability by a nonbankruptcy forum").

More recently, however, several bankruptcy courts have held that § 523(a)(19) does not limit their ability to determine liability on an underlying securities claim. *Holzhueter v. Groth (In re Holzhueter)*, 571 B.R. 812, 823 (Bankr. W.D. Wis. 2017) (holding that the text does not eliminate a bankruptcy court's authority to reach a substantive decision on a securities claim); *Tradex Glob. Master Fund SPC, Ltd. v. Chui (In re Chui)*, 538 B.R. 793, 807 (Bankr. N.D. Cal. 2015) (comparing both positions and concluding that bankruptcy courts may enter judgments on securities claims); *Hill*, 495 B.R. at 660-61 (finding that the unambiguous text of § 523(a)(19) does not preclude a bankruptcy court from entering a substantive judgment on a securities violation); *Jansma*, 2010 WL 282511, at *6 (holding that the order or judgment required by § 523(a)(19)(B) may be entered by a bankruptcy court in an adversary proceeding).

This Court agrees that bankruptcy courts have jurisdiction to determine liability on an underlying securities claim for purposes of § 523(a)(19). Interpretation of the Bankruptcy Code "begins where all such inquiries must begin: with the language of the statute itself." *United States*

*v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989). "[I]t is also where the inquiry should end, for

where, as here, the statute's language is plain, the sole function of the courts is to enforce it

according to its terms." *Id.* (internal quotation omitted). Section 523(a)(19) is no exception.

Nothing in the text of that provision limits a bankruptcy court's jurisdiction to make a liability

determination as to the underlying claim. *See* 11 U.S.C. § 523(a)(19). To the contrary, the text

expressly acknowledges that a debt for a securities violation or fraud may result from *any* judgment

or order "entered in *any* Federal or State judicial or administrative proceeding." 11 U.S.C. §

523(a)(19)(B)(i) (emphasis added). Bankruptcy adversary proceedings certainly fall within the

category of "any Federal judicial proceeding." Thus, the plain language of the statute authorizes

bankruptcy courts to make determinations of liability under § 523(a)(19).

### 2. Tillman's Securities Claims

Tillman alleges that Horlbeck violated three securities laws: (1) § 10(b) the Securities

Exchange Act of 1934 (codified as amended at 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5); (2)

§ 206(2) the Investment Advisers Act of 1940 (codified as amended at 15 U.S.C. § 80b-6(2)); and

(3) § 12(g) of the Illinois Securities Act of 1953, 815 ILCS 5/12(G) (2016). Horlbeck's initial

response is that Tillman has failed to allege and fully develop arguments under the specific

securities laws. Just as Judge Cassling rejected a similar argument that Horlbeck made in his

motion to dismiss back in 2016, the Court rejects the argument here. Tillman's motion for

summary judgment, reply in support thereof, and response to Horlbeck's motion for summary

judgment all allege specific claims under the three securities laws.

### a. Section 10(b) of the Securities Exchange Act of 1934

Section 10(b) of the Securities Exchange Act of 1934 prohibits the use of "any

manipulative or deceptive device or contrivance" in connection with "the purchase or sale of any

security" in contravention of rules and regulations prescribed by the Securities and Exchange

Commission.   15 U.S.C. § 78j(b).   Promulgated under that section, Commission Rule 10b-5

provides as follows:

> It shall be unlawful for any person, directly or indirectly, by the use of any means
> or instrumentality of interstate commerce, or of the mails or of any facility of any
> national securities exchange,
>
> > (a) To employ any device, scheme, or artifice to defraud,
> >
> > (b) To make any untrue statement of a material fact or to omit to state a material
> > fact necessary in order to make the statements made, in the light of the
> > circumstances under which they were made, not misleading, or
> >
> > (c) To engage in any act, practice, or course of business which operates or
> > would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.   Courts have implied a private cause of action for investors under Rule

10b-5, *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341 (2005), and Congress has imposed

requirements on such actions, *see, e.g.,* 15 U.S.C. § 78u-4(b) (setting forth the elements of private

securities fraud actions).   The basic elements of a Rule 10b-5 claim include: (1) a material

misrepresentation or omission; (2) scienter (i.e., a wrongful state of mind); (3) a connection with

the purchase or sale of a security; (4) reliance (also known as transaction causation); (5) economic

loss; and (6) loss causation.   *Dura*, 544 U.S. at 341-42.   The element that Horlbeck primarily

disputes in this case is loss causation.

In order to establish the element of loss causation, Tillman must prove that the material

misrepresentation (i.e., the false quarterly statements) caused the loss in value to the Tillman

Family's investments. *See* 15 U.S.C. § 78u-4(b)(4). Indeed, "[i]f the plaintiff cannot prove 'loss

causation'—that is, the fact that the defendant's actions had something to do with the drop in

value—then the claim must fail." *Ray v. Citigroup Glob. Mkts., Inc.*, 482 F.3d 991, 994-95 (7th Cir. 2007); *see also Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648-49 (7th Cir. 1997) (stating that "[t]o plead loss causation, the plaintiff must allege that it was the very facts about which the defendant lied which caused its injuries"). The rationale behind this requirement comes from the reality that "[w]hen the purchaser subsequently resells [his] shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price." *Dura*, 544 U.S. at 342-43.

Horlbeck argues that Tillman's 10b-5 claim must fail because there is no evidence that the false quarterly statements caused the loss in value to the Tillman Family's investments. Tillman's reply does not address this argument. However, Tillman's summary judgment motion argues that the false quarterly statements, coupled with distributions that Horlbeck took from the hedge fund, caused the loss in value. Despite this contention, Tillman fails to demonstrate how the distributions and the inflated values in the quarterly statements caused the securities held by the fund to lose value. Concealing a loss is different from causing it. As the United States Supreme Court has recognized, losses are often attributable to a myriad of causal factors. *Id.* Here, without any explanation or evidence of how the false quarterly statements and distributions actually led to the change in the securities' prices, the Court is unable to determine whether Horlbeck's actions are among the factors that may have caused the Tillman Family's investments to lose value. Having failed to establish the element of loss causation, Tillman's 10b-5 claim must fail.

### b. Section 206(2) of the Investment Advisers Act of 1940

Section 206(2) of the Investment Advisers Act of 1940 prohibits investment advisers from engaging "in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client." 15 U.S.C. § 80b-6(2). However, courts have not implied a private cause of action under § 206(2) as they have under § 10(b) of the Securities Exchange Act and corresponding Rule 10b-5. In fact, the Supreme Court has expressly held that "there exists a limited private remedy under the Investment Advisers Act of 1940 to void an investment advisers contract, but . . . the Act confers no other private causes of action, legal or equitable." *Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 24 (1979). At least one bankruptcy court has addressed whether a private party may bring a § 523(a)(19) claim based on an alleged violation of the Investment Advisers Act, holding that such a claim cannot "serve as the basis for nondischargeablity under section 523(a)(19)." *See Chui*, 538 B.R. at 808.

Tillman argues that *Chui's* holding does not apply in this case because the plaintiff in *Chui* sought an award of damages, while here, Tillman's "damages" have already been established by the Settlement Agreement. Tillman's argument misses the mark. Regardless of whether damages have already been established, the requirement of § 523(a)(19)(A)(i), that a debt be "for" a securities violation, cannot be satisfied by a plaintiff who has no actionable claim or remedy under the Act. As private individuals and entities, the members of the Tillman Family have no such claim or remedy. *See TAMA*, 444 U.S. at 24. Here, liability under § 523(a)(19) cannot be supported by an alleged violation of the Investment Advisers Act.

### c. Section 12(G) of the Illinois Securities Act of 1953

Section 12(G) of the Illinois Securities Act of 1953 provides that "[i]t shall be a violation of the provisions of this Act for any person . . . [t]o obtain money or property through the sale of

19

securities by means of any untrue statement of a material fact or any omission to state a material

fact necessary in order to make the statements made, in the light of the circumstances under which

they were made, not misleading." 815 ILCS 5/12(G). "The elements of a § 12(G) claim mirror

the elements of a Rule 10b-5 claim, except that the plaintiff is not required to prove scienter and

loss causation." *Elipas v. Jedynak*, No. 07 C 3026, 2011 WL 1706059, at *11 (N.D. Ill. May 5,

2011) (citing *Foster v. Alex*, 572 N.E.2d 1242, 1245 (Ill. App. Ct. 1991) and *Lucas v. Downtown

Greenville Inv'rs L.P.*, 671 N.E.2d 389, 398-400 (Ill. App. Ct. 1996)). Thus, the requisite elements

of a § 12(G) claim are that the defendant (1) made a material misrepresentation (2) in connection

with the purchase or sale of securities (3) upon which the plaintiff relied. *Hollerich v. Arci*, 259

F. Supp. 3d 806, 814 (N.D. Ill. 2017) (citing *Tirapelli v. Advanced Equities, Inc.*, 813 N.E.2d 1138,

1142 (Ill. App. Ct. 2004)). Here, Horlbeck argues that Tillman's § 12(G) claim must fail because

the anti-reliance clauses in the subscription agreements defeat the reliance requirement.

"Although normally a question of fact, a court can determine reasonable reliance as a

matter of law 'when no trier of fact could find that it was reasonable to rely on the alleged

statements or when only one conclusion can be drawn.'" *Tirapelli*, 813 N.E.2d at 1142-43 (citing

*Cozzi Iron & Metal, Inc. v. U.S. Office Equip., Inc.*, 250 F.3d 570, 574 (7th Cir. 2001)). Courts

typically find that reliance is unreasonable as a matter of law when a plaintiff alleging a securities

violation signed a subscription agreement containing an anti-reliance clause. *See generally

Rissman v. Rissman*, 213 F.3d 381, 384 (7th Cir. 2000) ("a written anti-reliance clause precludes

any claim of deceit by prior representations"); *Adler v. William Blair & Co.*, 648 N.E.2d 226, 232

(Ill. App. Ct. 1995) (finding that reliance was unreasonable where the plaintiff signed an anti-

reliance clause agreeing to rely solely on a memorandum but then alleged fraud because of a prior

representation that conflicted with it).

20

As in *Rissman*, *Tirapelli*, and *Adler*, Tillman alleges violations of securities laws based on misrepresentations made prior to the purchase of securities. Before making their investments, the members of the Tillman Family all signed subscription agreements in connection with the purchase of securities through the hedge fund. Those subscription agreements contained anti-reliance clauses under which the members of the Tillman Family represented that they relied solely on the memorandum and its related documents and their own independent investigations. They also acknowledged that no other representation outside of the memorandum and partnership agreement had been made with respect to their decision to purchase. Having both represented that they did not rely on anything else and acknowledged that no other representations had been made, Tillman cannot now maintain that the members of the Tillman Family relied on the quarterly statements in connection with the purchase of securities.

In summary, Tillman has failed to demonstrate that the debt owed under the Settlement Agreement is nondischargeable pursuant to § 523(a)(19). To the contrary, Horlbeck has established that the claims alleged by Tillman and the evidence offered in support thereof are insufficient to establish a securities violation or fraud. Thus, the Court will grant Horlbeck's motion for summary judgment on Count I of the amended complaint under § 523(a)(19), and Tillman's cross-motion will be denied.

## B. Section 523(a)(2)

Section 523(a)(2) provides that a discharge under § 727 does not discharge an individual debtor from any debt:

> for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
>
> > (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; [or]

21

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive[.]

11 U.S.C. § 523(a)(2)(A) & (B).

Subsections (A) and (B) of § 523(a)(2) are often described as mutually exclusive because the former expressly excludes situations involving the use of a statement respecting the debtor's financial condition, while the latter expressly requires such a statement. *See Rutili v. O'Neill (In re O'Neill)*, 468 B.R. 308, 343 (Bankr. N.D. Ill. 2012). Thus, a plaintiff cannot maintain claims under both §§ 523(a)(2)(A) and (a)(2)(B) based on the same misrepresentations. *Landmark Credit Union v. Sharp (In re Sharp)*, 561 B.R. 673, 678 (Bankr. N.D. Ill. 2016). If, however, a plaintiff alleges multiple misrepresentations, some involving a statement respecting the debtor's financial condition and others not involving such a statement, then each allegation should be evaluated independently under the applicable subsection. *See, e.g., GDO Inv., Inc. v. Glasgow (In re Glasgow)*, 370 B.R. 362, 372-77 (Bankr. D. Colo. 2007) (determining which subsection applied to seven alleged misrepresentations by considering whether each one involved a statement respecting the debtor's financial condition).

Tillman alleges that, in connection with the Settlement Agreement and Promissory Note, Horlbeck: (1) concealed his wrongdoing in connection with the hedge fund; (2) failed to disclose material aspects of the FINRA investigation; and (3) omitted contingent liabilities from the

22

Financial Affidavit. The first two allegations are governed by § 523(a)(2)(A) because neither relates to Horlbeck's financial condition. In contrast, the third allegation is governed by § 523(a)(2)(B) because the Financial Affidavit contains a wide range of information about Horlbeck's income, assets, and liabilities and is, thus, clearly a statement respecting his financial condition.

### 1. Section 523(a)(2)(A) (Count II)

In order to prevail under § 523(a)(2)(A), Horlbeck must demonstrate either that Tillman cannot prove the elements of the statutory exception by a preponderance of the evidence or that the claim fails as a matter of law. The threshold requirement of § 523(a)(2)(A) is that the defendant owes the plaintiff a debt. *Zirkel v. Tomlinson (In re Tomlinson)*, Adv. No. 96 A 1539, 1999 WL 294879, at *7 (Bankr. N.D. Ill. May 10, 1999). Further, the debt at issue must have been incurred for money, property, services, or an extension, renewal, or refinancing of credit. 11 U.S.C. § 523(a)(2)(A). The parties do not dispute that Horlbeck incurred a $1,265,000 debt to Tillman in exchange for credit extended under the Settlement Agreement and Promissory Note. They do, however, dispute whether Horlbeck obtained the credit by false pretenses, a false representation, or actual fraud.

To prove false pretenses or a false representation, Tillman must show that Horlbeck: (1) made a false representation or omission, which he either knew was false or made with reckless disregard to the truth; (2) that he intended to deceive Tillman; and (3) that Tillman justifiably relied on the representation or omission. *See Reeves v. Davis (In re Davis)*, 638 F.3d 549, 553 (7th Cir. 2011) (citing *Ojeda v. Goldberg*, 599 F.3d 712, 716-17 (7th Cir. 2010)). Failure to establish any one element is outcome determinative. *Bletnitsky v. Jairath (In re Jairath)*, 259 B.R. 308, 314 (Bankr. N.D. Ill. 2001). To prove actual fraud, Tillman need not demonstrate that Horlbeck made

23

a false representation. *See Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581, 1586 (2016) (holding that actual fraud includes fraudulent conveyance schemes not involving a false representation). Instead, "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another" is sufficient. *McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000).

### a. False Representation or Omission

The first element of § 523(a)(2)(A) varies depending on whether the claim is based on false pretenses, a false representation, or actual fraud. Often, conduct does not fit neatly into one category or another but instead amounts to a combination of the three. *See Merchs. Nat'l Bank of Winona v. Moen (In re Moen)*, 238 B.R. 785, 794 (B.A.P. 8th Cir. 1999).

For false pretenses, Tillman must show that Horlbeck engaged in "'a series of events, activities or communications which, when considered collectively, create[d] a false and misleading set of circumstances . . . in which [Tillman was] wrongfully induced by [Horlbeck] to transfer property or extend credit . . .'." *Attorneys' Title Guar. Fund, Inc. v. Wolf (In re Wolf)*, 519 B.R. 228, 246 (Bankr. N.D. Ill. 2014) (quoting *Sterna v. Paneras (In re Paneras)*, 195 B.R. 395, 406 (Bankr. N.D. Ill. 1996)). False pretenses do not necessarily involve express statements. *Paneras*, 195 B.R. at 406. Rather, an omission that impliedly creates a false impression as to particular facts is sufficient if Horlbeck knew the facts to be otherwise and failed to correct the false impression. *See Trizna & Lepri v. Malcolm (In re Malcolm)*, 145 B.R. 259, 263 (Bankr. N.D. Ill. 1992). For a false representation, Tillman must establish that Horlbeck misrepresented a material fact either with an express statement or through conduct. *See Wolf*, 519 B.R. at 246 (citing *Rae v. Scarpello (In re Scarpello)*, 272 B.R. 691, 700 (Bankr. N.D. Ill. 2002)).

24

To prove that Holbeck made a false representation or omission, Tillman highlights the differences in Horlbeck's correspondence with Tillman and his correspondence with FINRA. For example, in the July 9, 2009 response to FINRA, Horlbeck stated that he reported inflated values "in an effort to make the fund's performance appear better than it was[.]" By saying that he reported the figures "in an effort" to alter the appearance of the fund's performance, Horlbeck provided the reason for his actions. In doing so, he admitted that he made the conscious decision to report inflated values. In contrast, in the August 28, 2009 letter, Horlbeck told Tillman that he "had discovered errors with the [net] [a]sset [v]alue of the [hedge fund]." In that letter, Horlbeck used the word "discovered" rather than language to indicate that it was his intentional choice to report overstated values—something that he had previously admitted to FINRA. In fact, the letter to Tillman failed to disclose an investigation by FINRA and mentioned the regulatory agency only once, in the context of reporting compensation.

In correspondence after August 2009, Horlbeck alluded to the FINRA investigation only by referring to his "regulator" and mentioning "dealings with FINRA." Horlbeck also stressed the importance of Tillman going to FINRA only as "a last resort" because doing so could affect Horlbeck's livelihood and thus his ability to repay Tillman. In the July 2, 2010 email to Tillman, Horlbeck expressly discussed the potential consequences if FINRA got involved, warning that Tillman should not go to FINRA because such involvement could mean the end of his career.

Meanwhile, FINRA had been escalating its investigation. In fall and winter 2009, Horlbeck produced documents and answered investigative questions in response to requests sent by FINRA. Later, in November 2010, Horlbeck appeared for an on-the-record examination with FINRA. Subsequently, on May 17, 2011, FINRA advised Horlbeck of its preliminary determination to recommend disciplinary action against him. Almost seven months later, on

December 13, 2011, Horlbeck and FINRA entered into the AWC Agreement under which Horlbeck consented to a permanent bar from association with FINRA, thereby limiting his ability to work in the securities industry.

Horlbeck's statements to Tillman about his management of the fund were false and misleading. To say that he "discovered" reporting inaccuracies mischaracterizes his conduct in light of the earlier admission that he overstated account values "in an effort to make the fund's performance appear better than it was." Likewise, in his letters attributing losses to inadvertent overpayments and miscalculations, Horlbeck mischaracterizes his conduct by failing to acknowledge that he intentionally reported inflated account values. All of those statements were false representations. Furthermore, Horlbeck failed to inform Tillman about material details of the FINRA investigation throughout the course of their settlement negotiations. The withholding of those details created a false impression that FINRA was not actively investigating Horlbeck and that he would be able to continue associating with the regulatory agency for the indefinite future. Had Horlbeck disclosed to Tillman any details about the investigation, or even its existence, that disclosure would have corrected the false impression that there was no issue with FINRA. Horlbeck's entire deceitful course of conduct—from maintaining that he had merely discovered inaccuracies to withholding information about the existence and intensity of the FINRA investigation—involved false representations, omissions, and impressions. Accordingly, the first element of § 523(a)(2)(A) is satisfied under all three prongs of the statutory exception to discharge.

### b. Intent to Deceive

The second element of § 523(a)(2)(A), intent to deceive, may be established by direct evidence or through inference. *CFC Wireforms, Inc. v. Monroe (In re Monroe)*, 304 B.R. 349, 356 (Bankr. N.D. Ill. 2004) (citing *In re Sheridan*, 57 F.3d 627, 633 (7th Cir. 1995)). Direct evidence

of intent is rarely available, so courts often look to the "totality of the circumstances of a case."
*Cent. Credit Union of Ill. v. Logan (In re Logan)*, 327 B.R. 907, 911 (Bankr. N.D. Ill. 2005)
(internal quotation omitted).   Intent to deceive "may be inferred when the facts and circumstances
present a picture of deceptive conduct on the debtor's part."  *Id.* (internal quotation omitted).  For
example, where "'a person knowingly or recklessly makes a false representation which the person
knows or should know will induce another to [extend credit], intent to deceive may logically be
inferred.'"  *Sheridan*, 57 F.3d at 633.   Ultimately, "what courts need to do is determine whether
all the evidence leads to the conclusion that it is more probable than not that the debtor had the
requisite fraudulent intent."  *Chase Manhattan Bank v. Murphy (In re Murphy)*, 190 B.R. 327, 334
(Bankr. N.D. Ill. 1995).

The different stories that Tillman and FINRA each heard from Horlbeck are particularly
relevant to the issue of intent here.  Specifically, Horlbeck told Tillman that he had simply used
the wrong formula for calculating the net asset value of the investment accounts and that the hedge
fund performed poorly because of market influences.  As Tillman puts it, "Horlbeck crafted his
story . . . to create the false impression that he did nothing wrong, that everything was just an
accounting error."   (Adv. Dkt. 107 at 9-10.)   In telling that story, Horlbeck also actively
downplayed the existence and intensity of the FINRA investigation.  At the same time, Horlbeck
admitted to FINRA that he had intentionally inflated the account values on the hedge fund's
quarterly statements.

Intent to deceive may be logically inferred from Horlbeck's failure to disclose both that he
had intentionally inflated account values and that he was under serious investigation by FINRA.
Horlbeck should have known the effect that that information would have had on Tillman's
willingness to extend credit to him.  In fact, it is likely that Horlbeck chose to make false

representations and omit that information because of the effect he knew it would have on negotiations with Tillman. Based on these circumstances, the Court finds that Horlbeck intended to deceive Tillman with respect to his mismanagement of the fund and the FINRA investigation.

### c. Justifiable Reliance

The final element of § 523(a)(2)(A) is that the creditor's reliance on the false representation or omission must be "justifiable." *Field v. Mans*, 516 U.S. 59, 74-75 (1995). Justifiable reliance is a subjective standard that depends on the characteristics of the particular plaintiff and the circumstances of the particular case. *Id.* at 71; *Bombardier Capital, Inc. v. Dobek (In re Dobek)*, 278 B.R. 496, 508 (Bankr. N.D. Ill. 2002). Importantly, the justifiable reliance standard does not impose an affirmative duty on the creditor to investigate, "although he might have ascertained the falsity had he made an investigation." *Field*, 516 U.S. at 70 (internal quotation omitted). That said, a creditor is "'required to use his senses'" and "'cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.'" *Id.* at 71 (quoting Restatement (Second) of Torts § 541, cmt. a (1976)).

Horlbeck's argument with respect to § 523(a)(2)(A) focuses primarily on reliance. Specifically, Horlbeck contends that Tillman did not rely, justifiably or otherwise, on any representation or omission. Horlbeck further argues that to the extent that he disclosed the FINRA investigation, that disclosure triggered a duty on Tillman to investigate further, and failure to do so made Tillman's reliance unjustifiable. According to Horlbeck, Tillman did not rely on any representations or omissions because Tillman's conduct in retaining counsel, investigating, and entering into a settlement agreement demonstrates that Tillman believed that Horlbeck had engaged in wrongdoing. In support of that argument, Horlbeck cites to *Field v. Mans* for the

proposition that a creditor cannot justifiably rely on a debtor's statement if a reasonable person with the creditor's knowledge and intelligence would know that the statement was false at a cursory glance.

Horlbeck's argument is meritless. As discussed above, the Supreme Court rejected the reasonable person standard in *Field v. Mans* and instead held that a subjective justifiable reliance standard applies to § 523(a)(2)(A). *Id.* at 77. Horlbeck correctly states, however, that a creditor cannot claim that it relied on a debtor's representation if the creditor knew the representation was false. *See Soules v. Gen. Motors Corp.*, 402 N.E.2d 599, 601 (Ill. 1980). Despite Horlbeck's accurate recitation of that rule, its application to the present case is misplaced. Tillman might have *believed* or *suspected* that Horlbeck engaged in wrongdoing, but there is no evidence that Tillman *knew* any of the representations were false. Tillman's belief or suspicion of Horlbeck's wrongdoing does not negate the possibility of reliance on statements that he made. To the contrary, Tillman's likely purpose in investigating Horlbeck was to obtain reliable information from him.

The Court also rejects Horlbeck's second argument, that Tillman's reliance is not justified because Tillman failed to investigate further upon the disclosure of some information about FINRA. As discussed above, there is no affirmative duty to investigate under the justifiable reliance standard. *See Field*, 516 U.S. at 70. However, reliance is not justifiable if the falsity is "easily detectable," *Dobek*, 278 B.R. at 508, or if the creditor "bur[ies] his head in the sand" and "ignore[s] obvious falsehoods." *Jairath*, 259 B.R. at 315 (internal quotation omitted). As previously discussed, several of Horlbeck's letters and emails to Tillman mentioned FINRA but discouraged involving the regulator. The correspondence did not contain any obvious falsehoods that would have triggered a duty to investigate further. Thus, the evidence shows that Tillman

29

justifiably relied on false representations and omissions made by Horlbeck with the intent to deceive in connection with the Settlement Agreement and Promissory Note.

Having determined that all of the elements of § 523(a)(2)(A) have been satisfied, the Court will deny Horlbeck's motion for summary judgment on Count II of the amended complaint under § 523(a)(2)(A). In addition, although Tillman did not file a cross-motion on Count II, the Court will grant summary judgment *sua sponte* in Tillman's favor under § 523(a)(2)(A). *See* Fed. R. Civ. P. 56(f). Both the Supreme Court and the Seventh Circuit Court of Appeals have recognized that a court is permitted to enter summary judgment *sua sponte*. *See Celotex*, 477 U.S. at 326; *see also Hunger v. Leininger*, 15 F.3d 664, 669 (7th Cir. 1994). It is important to note, however, that the procedure warrants "special caution" to ensure that the losing party was afforded the necessary safeguards. *See Goldstein v. Fid. & Guar. Ins. Underwriters, Inc.*, 86 F.3d 749, 751 (7th Cir. 1996) (internal quotation omitted). Specifically, the losing party must have been "given notice and an opportunity to come forward with its evidence."[7] *Jones v. Union Pac. R. Co.*, 302 F.3d 735, 740 (7th Cir. 2002). That requirement is satisfied when a court agrees with the movant that there is no dispute of material fact and the court's decision hinges on questions of law. *See, e.g., Goldstein*, 86 F.3d at 751. In such a case, it is appropriate to grant summary judgment *sua sponte*. *Id.* Here, the Court agrees with Horlbeck's contention that there is no genuine dispute as to a material fact but disagrees with his argument that the § 523(a)(2)(A) claim fails as a matter of law. To the contrary, the Court determined that all of the elements of that section have been satisfied.

---

[7] "In other words, the entry of summary judgment [*sua sponte*] is inappropriate when it takes a party by surprise." *Goldstein*, 86 F.3d at 750. Here, it would be absurd to say that the entry of summary judgment for Tillman under § 523(a)(2)(A) will take Horlbeck by surprise. Horlbeck's § 523(a)(2)(A) motion, along with the related response, reply, statements of fact, and evidence, thoroughly addressed every element of that exception to discharge. Although Tillman did not expressly request judgment under § 523(a)(2)(A), the parties, Horlbeck in particular, were on notice that summary judgment was being considered.

Therefore, summary judgment will be granted *sua sponte* on Count II of the amended complaint under § 523(a)(2)(A) in Tillman's favor.

## 2. Section 523(a)(2)(B) (Count III)

Section 523(a)(2)(B) excepts debts from discharge that were incurred for money, property, services, or an extension of credit to the extent obtained by use of a fraudulent written statement respecting the debtor's financial condition. 11 U.S.C. § 523(a)(2)(B). Both parties have moved for summary judgment under this statutory exception. In order to prevail, Tillman must prove that each element of the claim is satisfied by a preponderance of the evidence. In contrast, Horlbeck must demonstrate that Tillman cannot prove the elements of § 523(a)(2)(B) or that the claim fails as a matter of law.

In order to establish the requirements of § 523(a)(2)(B), Tillman must prove that (1) Horlbeck made a statement in writing, (2) respecting his financial condition, (3) that was materially false, (4) with intent to deceive, and (5) that Tillman reasonably relied on the statement. *See Fischer Inv. Captial, Inc. v. Cohen (In re Cohen)*, 507 F.3d 610, 613 (7th Cir. 2007). Tillman argues that the elements of § 523(a)(2)(B) are satisfied because Horlbeck omitted $1.3 million in liabilities from the Financial Affidavit, and Tillman reasonably relied on the Affidavit in deciding to extend credit under the Promissory Note. The parties do not dispute that the Affidavit is a statement in writing respecting Horlbeck's financial condition. Thus, the first and second elements are satisfied. However, the parties dispute the remaining elements, which the Court will now address in turn.

### a. Materially False

There is more than one way for a creditor to prove that a statement is materially false for purposes of § 523(a)(2)(B). If the statement "paints a substantially untruthful picture of a financial

31

condition by misrepresenting information of the type which would normally affect the decision to

grant credit," then it is materially false. *Webster Bank, Nat'l Ass'n v. Contos (In re Contos)*, 417

B.R. 557, 564 (Bankr. N.D. Ill. 2009) (internal quotation omitted). Alternatively, a statement is

materially false if a creditor would not have extended credit had it been aware of the

misrepresentation. *See In re Bogstad*, 779 F.2d 370, 375 (7th Cir. 1985). Similarly, if an applicant

fails to disclose a substantial debt on a loan application, then the omission is considered a

materially false statement. *See Selfreliance Fed. Credit Union v. Harasymiw (In re Harasymiw)*,

895 F.2d 1170, 1174 (7th Cir. 1990) (affirming the district court which held that a debt was not

dischargeable because the loan applicant failed to disclose a $128,000 mortgage); *Citibank (S.D.),*

*N.A. v. Harris (In re Harris)*, 203 B.R. 117, 122 (Bankr. N.D. Ill. 1996) (finding that the omission

of over $20,000 of debt on a loan application constituted material falsity).

Contingent liabilities are among the types of debts which, if omitted, may cause a statement

to be materially false. *See Union Planters Bank, N.A. v. Martin (In re Martin)*, 299 B.R. 234, 241

(Bankr. C.D. Ill. 2003), *aff'd*, 306 B.R. 591 (C.D. Ill. 2004). As explained in *Martin*,

> The omission of contingent liabilities is especially material when the debtor is
> sophisticated and consciously aware of the existence of the liability. When the
> debtor is aware of a contingent liability, knows it is substantial, realizes the personal
> nature of the liability, and recognizes it is a material factor in assessing the financial
> condition of the individual, a debtor is under a duty to disclose the contingent
> liability to a lender relying on a financial statement.

*Id.* at 240-41 (citations omitted). A debt is contingent if either its existence or amount depends on

some future event that may or may not occur. *Freeland v. Enodis Corp.*, 540 F.3d 721, 730 (7th

Cir. 2008) (citing *In re Knight*, 55 F.3d 231, 236 (7th Cir. 1995)).

Horlbeck first argues that the Financial Affidavit was not materially false because, while

he had a duty to disclose fixed and contingent liabilities, he did not have a duty to disclose

32

"possibilities of a claim." (Adv. Dkt. 85 at 15.) The distinction that Horlbeck tries to make

between "contingent liabilities" and "possibilities of a claim" is disingenuous.   Horlbeck

undisputedly sent letters to the hedge fund's investors, promising checks and promissory notes

contingent on the execution of releases. On Horlbeck's own terms, the liabilities to other investors

on those promissory notes were contingent. (*See* Adv. Dkt. 85-37 at 7, Ex. 11 ("I will enter in a

promissory note . . . which you will receive a copy of upon execution of the enclosed release");

Ex. 12 ("enclosed is a photocopy of your check which will be sent to you directly . . . when we

receive the enclosed release signed . . . [it] is not quite the full amount owed, but you will receive

a promissory note for additional payments . . . .").) Horlbeck even admitted that he "sent letters to

the Fund's investors . . . indicating that checks and promissory notes representing the balance owed

to investors were being sent to the investors, *contingent* upon receiving their releases." (*Id.* at 7

(emphasis added).)

Next, Horlbeck argues that even if he did have a duty to disclose the contingent liabilities

to other investors, there is no way to determine whether they were material because there is no

evidence of the amount owed.  That is, if the amounts owed were very small, then the omitted

liabilities would not have been material because such a minimal amount would not have influenced

Tillman's decision to extend credit. The evidence offered by Horlbeck himself, however, provides

enough information to determine that the liabilities omitted from the Financial Affidavit were

material.

In the August 28, 2009 letters, Horlbeck proposed to pay investors $464,988.  Later, in the

November 10, 2009 letters, he stated that he had received most of the settlements and releases

back.  The first letters establish that Horlbeck had contingent liabilities to investors of at least

$464,988. The second letters establish that some of the contingent liabilities became fixed after

investors executed releases, while the other liabilities remained contingent upon the signing of releases. One month after signing the Financial Affidavit, in the on-the-record interview with FINRA, Horlbeck even admitted that he had been continually paying some investors under promissory notes. Further, about six years after the letters were written, schedule F of Horlbeck's bankruptcy petition listed $1.3 million owed to investors for "promissory notes." Those notes were dated between 2008 and 2010, and the amounts range from $7,093.60 to $550,000.

Based on the 2009 letters, Horlbeck agreed to pay investors at least $464,988, fixed in part and contingent in part. The figures from Horlbeck's bankruptcy petition, however, show that he may have owed a whole lot more. Even without the exact figures, the evidence establishes that the liabilities that Horlbeck left off the Financial Affidavit were substantial, making the omission of them material for purposes of § 523(a)(2)(B).

### b. Reasonable Reliance

The next requirement of § 523(a)(2)(B) is that the creditor actually and reasonably relied on the debtor's misrepresentation or omission. *Contos*, 417 B.R. at 566. In this context, "reasonableness is circumstantial evidence of actual reliance," meaning that "a creditor should not be denied protection against discharge unless 'the creditor's claimed reliance would be so unreasonable as not to be actual reliance at all.'" *In re Morris*, 223 F.3d 548, 553 (7th Cir. 2000) (quoting *N. Tr. Co. v. Garman (In re Garman)*, 643 F.2d 1252, 1256 (7th Cir. 1980)). Reasonableness is judged on a case-by-case basis, *In re Bonnett*, 895 F.2d 1155, 1157 (7th Cir. 1989), and courts should not "undertake a subjective evaluation and judgment of a creditor's lending policy and practices." *Garman*, 643 F.2d at 1256.

In general, creditors need not have undertaken any sort of investigation in order to establish reasonable reliance. *Mayer v. Spanel Int'l Ltd.*, 51 F.3d 670, 676 (7th Cir. 1995). "A victim who

34

lacks access to the truth, and has not been alerted to facts that would alert him to the truth, is not to . . . be blocked by a discharge under the bankruptcy laws—just because he did not conduct a more thorough investigation." *Id.* However, a creditor "cannot close his eyes to a known risk." *Id.* "If the [creditor] possesses information sufficient to call the representation into question, he cannot claim later that he relied on or was deceived by the lie." *Id.*

Tillman first argues that actual reliance is established by Warner Tillman's deposition testimony, in which he stated that he would not have entered into the Settlement Agreement had he known that Horlbeck had already provided promissory notes to other investors. (Adv. Dkt. 82 at 10.) In response, Horlbeck contends that Tillman's § 523(a)(2)(B) claim must fail because it would have been impossible for Tillman to have actually relied on the Financial Affidavit, which was dated October 14, 2010, when signing the Settlement Agreement on September 27, 2010. Horlbeck further argues that even if Tillman can prove actual reliance, that reliance was unreasonable because the contingent liabilities and promissory notes were disclosed in earlier letters.

Horlbeck's first argument is unsubstantiated. When Tillman's attorney sent the signed Settlement Agreement to Horlbeck's attorney, he included an instruction to hold it in escrow subject to receipt and approval of documents from Horlbeck. The Settlement Agreement did not become finalized until Tillman received all of the documents, including the Financial Affidavit. The information contained in the Affidavit was clearly material to Tillman for purposes of entering into the Settlement Agreement and Promissory Note. As such, the evidence shows that Tillman actually relied on the Financial Affidavit.

Further, Tillman's reliance on the Financial Affidavit was reasonable. With knowledge of the settlement offers that had been made to other investors, Tillman negotiated with Horlbeck and

35

required him to disclose liabilities as part of their agreement. Apparently, the Financial Affidavit

was sufficient to dispel any of Tillman's concerns about other liabilities. It is not the Court's place

to subjectively evaluate Tillman's decision to extend credit to Horlbeck. Rather, the Court must

determine only whether Tillman's reliance was "so unreasonable as not to be actual reliance at

all." In light of Tillman's insistence on the completion of the Financial Affidavit, the Court

concludes that its reliance was reasonable.

### c. Intent to Deceive

As discussed above in the context of § 523(a)(2)(A), here too intent to deceive may be

established by direct evidence, or it may be logically inferred from a false representation or

omission that Horlbeck knew or should have known would induce Tillman to extend credit.

*Contos*, 417 B.R. at 565 (citing *Sheridan*, 57 F.3d at 633-34). The court may also infer intent to

deceive from a showing of reckless indifference to, or disregard for, the accuracy of a financial

statement. *Id.* (citing *Phillips v. Napier (In re Napier)*, 205 B.R. 900, 907 (Bankr. N.D. Ill. 1997));

*see also, e.g., Cmty. Bank of Homewood-Flossmoor v. Bailey (In re Bailey)*, 145 B.R. 919, 931

(Bankr. N.D. Ill. 1992) (inferring intent to deceive where the debtor valued property at $990,000

on a lender's financial statement seven months before valuing the same property at $400,000 on

his bankruptcy schedules). Once a creditor establishes the requisite intent, a mere unsupported

assertion of honest intent is insufficient to overcome the inference. *N. Shore Sav. & Loan Ass'n

v. Jones (In re Jones)*, 88 B.R. 899, 903 (Bankr. E.D. Wis. 1988).

To prove that Horlbeck had the requisite intent, Tillman asserts that the omission of debt

for the contingent settlement offers and promissory notes cannot be viewed as an honest mistake

in light of his other conduct. Tillman argues that Horlbeck's deceptive intent should be inferred

because he knew, or at least should have known, that information about the debt to other investors

should have been disclosed in the Financial Affidavit. Horlbeck offers no direct response on the issue of intent but instead focuses his argument on whether he had a duty to disclose the debts or, as he calls them, the "possibilities of claims." The Court has already considered that argument and found that the debts were contingent liabilities which Horlbeck had a duty to disclose. The Court concludes that intent to deceive has been established because Horlbeck showed reckless disregard for the accuracy of the Financial Affidavit, and he knew or should have known that the omission of liabilities from the Affidavit would induce Tillman to extend credit. Thus, Tillman has satisfied all of the elements of § 523(a)(2)(B). Accordingly, the Court will grant Tillman's motion for summary judgment on Count III of the amended complaint under § 523(a)(2)(B), and Horlbeck's cross-motion will be denied. The debt Horlbeck owes to Tillman under the Settlement Agreement and Promissory Note is not dischargeable.

## CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part the parties' cross-motions for summary judgment. Summary judgment will be entered in Horlbeck's favor on Count I of the amended complaint under § 523(a)(19), and summary judgment will be entered in Tillman's favor on Counts II and III under §§ 523(a)(2)(A) and (a)(2)(B). A separate order will be entered consistent with this Memorandum Opinion.

Dated: **September 14, 2018**                    ENTERED:

_____
Janet S. Baer
United States Bankruptcy Judge

37